IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

KIMBERLY A. C.,[1]       )
                         )
      Plaintiff,    )
                         )
vs.                      )  Case No. 18-cv-2152-DGW[2]
                         )
COMMISSIONER of SOCIAL   )
SECURITY,                )
                         )
      Defendant.    )

## **MEMORANDUM and ORDER**

**WILKERSON, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff, represented by counsel, seeks judicial review of the final agency decision denying her application for Supplemental Security Income (SSI) benefits pursuant to 42 U.S.C. § 423.

## **Procedural History**

Plaintiff applied for disability benefits in November 2012, alleging disability as of September 15, 2010. After holding an evidentiary hearing, an ALJ denied the application in February 2015. (Tr. 12-19). Plaintiff sought judicial review, and the case was remanded to the agency by agreement of the parties. (Tr. 1376-1380). On remand, the same ALJ again denied the application in July 2016.

---

[1] In keeping with the court's practice, plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. See, Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c). See, Docs. 10 & 18.

That decision is the final agency decision. (Tr. 1325-1333). Administrative remedies have been exhausted and a timely complaint was filed in this Court.

## Issues Raised by Plaintiff

Plaintiff raises the following points:

1. The ALJ erred in assessing the reliability of plaintiff's subjective allegations.

2. The ALJ erred in weighing the medical opinions.

3. The testimony of the vocational expert (VE) was not supported by substantial evidence.

## Applicable Legal Standards

To qualify for SSI, a claimant must be disabled within the meaning of the applicable statutes.[3] Under the Social Security Act, a person is disabled if he has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a).

To determine whether a plaintiff is disabled, the ALJ considers the following five questions in order: (1) Is the plaintiff presently unemployed? (2) Does the plaintiff have a severe impairment? (3) Does the impairment meet or medically

---

[3] The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

equal one of a list of specific impairments enumerated in the regulations? (4) Is the plaintiff unable to perform his former occupation? and (5) Is the plaintiff unable to perform any other work?  20 C.F.R. § 404.1520.

An affirmative answer at either step three or step five leads to a finding that the plaintiff is disabled. A negative answer at any step, other than at step three, precludes a finding of disability. The plaintiff bears the burden of proof at steps one through four. Once the plaintiff shows an inability to perform past work, the burden then shifts to the Commissioner to show that there are jobs existing in significant numbers in the national economy which plaintiff can perform. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). This Court uses the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

**<u>The Decision of the ALJ</u>**

The ALJ followed the five-step analytical framework described above. He determined that plaintiff had never worked at the level of substantial gainful activity. She was born in 1967 and was 49 years old on the date of the ALJ's decision.[4]

The ALJ found that plaintiff had severe impairments of joint dysfunction with residuals of left total knee replacement; obesity; cor pulmonale; degenerative disc disease; and cardiomyopathy.[5]

The ALJ found that plaintiff had the residual functional capacity (RFC) to perform work at the sedentary exertional level limited to no climbing of ladders, ropes, and scaffolding; no kneeling, squatting, or crawling; occasional stooping,

---

[4] Plaintiff turned 50 years old about a year after the ALJ's decision. Under the Medical-Vocational Guidelines ("Grids") 20 C.F.R. Pt. 404, Subpt. P, App. 2, Table 1, with no transferrable skills, she would be deemed disabled at age 50 if she were limited to sedentary work.

[5] "Cor pulmonale is an increase in bulk of the right ventricle of the heart, generally caused by chronic diseases or malfunction of the lungs." https://medical-dictionary.thefreedictionary.com/cor+pulmonale; visited on September 19, 2019.

crouching, reaching overhead, and climbing ramps and stairs; no concentrated exposure to extreme temperatures or pulmonary irritants; and no exposure to moving machinery, unprotected heights, or uneven surfaces. She needed a sit/stand option at will provided it would not cause her to be off-task more than 10% of the workday. She also had mental limitations which are not in issue here.

Plaintiff had no past relevant work. Based on the testimony of a vocational expert, the ALJ concluded that plaintiff was not disabled because she was able to do jobs that exist in significant numbers in the national economy.

## **The Evidentiary Record**

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to plaintiff's arguments.

1. **Agency Forms**

In a Function Report submitted in April 2012, plaintiff said she could not work because she had trouble walking and standing. She could not do anything if her pain got really bad. She did housework as she was able. She needed frequent breaks. (Tr. 1503-1511). In July 2013, she reported that her pain was mostly in her knees and back, but other joints also hurt, and she had pain in her whole body. (Tr. 221).

2. **Evidentiary Hearing**

Plaintiff was represented by an attorney at the first evidentiary hearing in

January 2015. (Tr. 45). Plaintiff testified that she had gotten back on health insurance about six months earlier. (Tr. 50-51).

She was represented by the same attorney at the second hearing in May 2016. (Tr. 1344). She had moved to Wood River, Illinois. (Tr. 1345). She was trying to establish care with new doctors. (Tr. 1349).

Plaintiff was about 5' 4" tall and weighed about 270 pounds. She had her left knee replaced before she moved from Wisconsin to Illinois. Her knee was a little bit better, but she still had pain and stiffness and could not walk any distance. She had to establish care with a new doctor to consult about having the right knee replaced. She could only sit for a short time. She had to prop her legs up because of swelling. Arthritis had spread from her back into her hips. (Tr. 1350-1351).

She had missed medical appointments in Wisconsin because she did not have transportation. In Illinois, her sister-in-law drove her to appointments. (Tr. 1352, 1354).

Plaintiff's lawyer asked why she could not do a seated job without a lot of lifting requirements. She said it was because she had no training for jobs like that. (Tr. 1353).

Plaintiff testified that she could not walk without holding onto something. She had a cane. She needed support because of pain and her knees giving out. (Tr. 1357). She used an inhaler for breathing problems. (Tr. 1359).

A VE testified that a person with the RFC assessed by the ALJ could do the

jobs of telephone quotation clerk, order clerk, and packer. He testified that a sit/stand option is not addressed in the *Dictionary of Occupational Titles*. He based his testimony about the effect of a sit/stand option of the availability of jobs on his professional experience. He gained his knowledge from more than six years of doing job placement and job development and attending multiple conferences. Counsel asked whether he had records or empirical studies to show the basis of his testimony. The ALJ said he would not make the ALJ produce those materials, if they existed. (Tr. 1366-1372).

Counsel asked that the date of onset be amended to November 28, 2012, the date of the application. (Tr. 1374).

3.  **Relevant Medical Records**

In June 2010, x-rays showed moderately severe degenerative changes in both knees, more severe on the left. (Tr. 530).

Plaintiff established care with Dr. Kasirye in February 2012. She had not seen a doctor for some time because she did not have insurance. She had a history of chronic low back pain secondary to disc disease which had been treated with injections in the past. She had a diagnosis of positive Lupus anticoagulant status with a history of deep vein thrombosis. She also had suspected cardiomyopathy. She had swelling of the legs which improved with elevating her legs. She had bilateral knee pain which was getting progressively worse. (Tr. 407-411).

Dr. Farooque evaluated her back pain in March 2012. He had seen her in 2005. She complained of low back pain. She denied any pain shooting into the

legs. On exam, the lumbar range of motion was limited. There was no lower extremity radiation. There was diffuse tenderness over the lumbar spine. Her gait was normal. Dr. Farooque assessed chronic lower back pain. He recommended smoking cessation and weight loss. He prescribed physical therapy and referral to pain clinic. (Tr. 401-404).

A pain clinic doctor consulted with plaintiff in March 2012. She did not have insurance and so was not enrolled as a patient. (Tr. 388-392).

Plaintiff had a pulmonary embolism in January 2013. She was on anticoagulant therapy, managed by the Anticoagulation Clinic. (Tr. 369).

In March 2013, Dr. Kasirye noted that plaintiff "continued to struggle with spasms in her back secondary to the pulmonary embolism in her right lung." She was taking Tramadol for pain. She complained of knee pain and was given steroid shots in the knees. Dr. Kasirye noted that her "morbid obesity" contributed to her knee pain. The next month, Dr. Kasirye prescribed knee braces to help with distribution of her weight and muscle strengthening around the knee joints. He also diagnosed fibromyalgia which was improved with amitriptyline. (Tr. 350-357). In May 2013, Dr. Kasirye noted that her weight (274 pounds) was the "driving factor" in her knee pain. She had failed to turn in needed paperwork for insurance coverage. He noted her "chronic behavior of noncompliance." (Tr. 342-345).

Dr. Johnson performed a consultative physical exam in November 2013. Plaintiff was poorly deconditioned and obese. She had degenerative arthritic

knees with significant arthritis, left worse than right. He thought she was not a good candidate for a knee replacement. She also had a clotting disorder. The doctor concluded that she should avoid heights, inclines, and uneven surfaces, and should perform no work on her knees or squat. (Tr. 719-724).

In January 2014, Dr. Kasirye noted that plaintiff was under "enormous stress" because she was about to be evicted from her trailer home. Her fibromyalgia was stable. She was to be evaluated by an orthopedic doctor regarding possible knee replacement. She continued to take Coumadin for bilateral pulmonary embolism. (Tr. 743-746). She had missed an appointment for a prior orthopedic evaluation because she could not get a ride to the doctor's office. (Tr. 753).

Plaintiff saw Dr. Kasirye in August 2014, complaining of pain in her knees "so severe that she can barely transfer." On exam, he noted degenerative joint disease and deformity in both knees. Plaintiff said she had missed prior appointments for an orthopedic evaluation because of "lack of finances" and inability to get to the doctor's office in Marshfield, Wisconsin. However, she was now living with her son and would be able to make the appointment. (Tr. 1727-1729).

Plaintiff saw Dr. Simenstad, an orthopedic specialist, in April 2015. X-rays of her knees showed bilateral grade IV medial compartment osteoarthritis. (Tr. 1681). Dr. Simenstad described the osteoarthritis as "bone on bone." In addition to her severe knee osteoarthritis, he noted a history of chronic back pain.

He concluded that she was a candidate for a left knee replacement. (Tr. 1683-1686). Plaintiff was scheduled for surgery in April 2015, but surgery was cancelled because she had a dental infection. (Tr. 1661).

The left total knee replacement was done in July 2015. (Tr. 1920). She was discharged from the hospital two days later and was issued a front-wheeled walker. (Tr. 1988). She was seen by a nurse about two weeks later and the sutures were removed. There was moderate swelling around the knee but no redness or drainage. She had been doing exercises that she had been taught in the hospital but had not been to physical therapy. The nurse advised her that in-home exercises did not take the place of formal physical therapy and that total healing would take 6 to 12 months. She could not drive for 6 weeks and was to wear a knee immobilizer at night. She was to see Dr. Simenstad in 4 weeks. (Tr. 1583). There is no record of a post-op visit with Dr. Simenstad.

Plaintiff missed several appointments for blood-draws to evaluate her anticoagulant therapy. (Tr. 1542).

Dr. Kasirye saw plaintiff in December 2015. Her weight was down to 243 pounds. She "continues to struggle with psychosocial stressors which are predominantly financial." She complained of depression. She had been denied disability benefits multiple times. She told the doctor she was doing some babysitting. He thought she was employable in a job that mostly required use of her hands and encouraged her to look for a job instead of "sitting back and feeling sad about herself." The assessment included depression with anxiety,

fibromyalgia, and bilateral edema of the lower extremities. She was to start Prozac for depression, take diuretics for the edema, and to follow-up with orthopedics for her knee replacement. (Tr. 1558-1562).

In March 2016, plaintiff called Dr. Kasirye's office with questions about how to find a new doctor. She had recently moved to Wood River, Illinois, "due to financial issues." (Tr. 1541).

## Analysis

Plaintiff argues first that the ALJ erred in determining the reliability of her subjective allegations.

SSR 16-3p, effective March 28, 2016, superseded SSR 96-7p on evaluating the claimant's statements about his symptoms. SSR 16-3p does not change the prior standard; rather, it emphasizes that:

> In evaluating an individual's symptoms, our adjudicators will not assess an individual's overall character or truthfulness in the manner typically used during an adversarial court litigation. The focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person. Rather, our adjudicators will focus on whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and given the adjudicator's evaluation of the individual's symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities. . . .

SSR 16-3p, 2016 WL 1119029, at *10.

As did SSR 96-7p, the new SSR requires the ALJ to consider the entire record, and to consider a number of factors in assessing the claimant's credibility, including the objective medical evidence, the claimant's daily activities, medication

for the relief of pain, and "any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms." SSR 16-3p, at *7.

Plaintiff is correct that the ALJ erroneously discredited her claims because she was "noncompliant" with treatment recommendations. The ALJ remarked twice upon her noncompliance and failure to appear for appointments, which he termed "not consistent with allegations of disability." (Tr. 1328, 1331). However, he failed to consider the reason for her noncompliance. This was error. *Gerstner v. Berryhill*, 879 F.3d 257, 265 (7th Cir. 2018); *Garcia v. Colvin*, 741 F.3d 758, 761-762 (7th Cir. 2013).

Plaintiff testified that she had missed medical appointments in Wisconsin because she did not have transportation. (Tr. 1352, 1354). As is detailed in the above summary of the medical records, her primary care physician noted several times that she missed medical appointments due to financial and transportation issues, and she was not accepted as a patient by the pain management specialist because she had no insurance.

The Commissioner argues that "A plain reading of the ALJ's decision suggests he did not find Plaintiff's reasons for lack of treatment persuasive." Doc. 28, p. 7. However, because the ALJ never mentioned plaintiff's reasons for lack of treatment, the suggestion that he found her reasons not to be persuasive is pure speculation. The ALJ's decision cannot be upheld based upon the Commissioner's after-the-fact rationalization. *Hughes v. Astrue*, 705 F.3d 276, 279 (7th Cir. 2013).

The ALJ also cast doubt on plaintiff's testimony that she was waiting to establish care with a new doctor, stating that there was no documentation in the medical records. The ALJ overlooked the note of the telephone call in March 2016 in which plaintiff asked questions about getting a new doctor as she had moved from Wisconsin to Illinois.

Plaintiff's second point is not well-taken. The ALJ did not err in weighing the medical opinions. Contrary to plaintiff's suggestion, he did, in fact, incorporate the limitations suggested by the consultative examiner into his RFC assessment.

Plaintiff's last point is not as clear as it could be. She appears to be arguing that the VE's testimony did not constitute substantial evidence because the VE did not produce any documents supporting his testimony regarding job numbers and the availability of a sit/stand option. However, the Supreme Court has declined to adopt such a categorical rule. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1157 (2019). Plaintiff cites *McKinnie v. Barnhart*, 368 F.3d 907 (7th Cir. 2004), but *McKinnie* laid down the very rule that was rejected by the Supreme Court. *Biestek*, 139 S. Ct. at 1154. Plaintiff offers no other specific criticism of the VE's testimony.

The erroneous credibility determination requires remand. "An erroneous credibility finding requires remand unless the claimant's testimony is incredible on its face or the ALJ explains that the decision did not depend on the credibility finding." *Pierce v. Colvin*, 739 F.3d 1046, 1051 (7th Cir. 2014). Here, plaintiff's testimony is not incredible on its face, and it is clear that the decision depended in

large part on plaintiff's credibility.

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that plaintiff was disabled during the relevant period or that she should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying plaintiff's application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATE:   September 30, 2019.**


**DONALD G. WILKERSON**
**UNITED STATES MAGISTRATE JUDGE**